39 P.3d 651

**STATE of Idaho, Plaintiff–Appellant,**

v.

**Kim YOUNG, Defendant–Respondent.**

**State of Idaho, Plaintiff–Appellant,**

v.

**Raina Young, Defendant–Respondent.**

**Nos. 27041, 27042.**

Court of Appeals of Idaho.

Jan. 10, 2002.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for appellant. Kenneth K. Jorgensen, argued.

Cooper, Wetzel, Avery Lee, Idaho Falls, for respondents. Royce B. Lee argued.

PERRY, Judge.

In these consolidated cases, the state appeals from the district court's order granting Kim Young's motion to suppress evidence seized pursuant to a search warrant and his motion to suppress statements made prior to

receiving *Miranda*[1] warnings. The state also appeals from the district court's order granting Raina Young's motion to suppress evidence seized pursuant to the same search warrant. We reverse the district court's orders granting the Youngs' motions to suppress and remand.

## I.

### FACTS AND PROCEDURE

A Bonneville County Sheriff's officer received information from two confidential informants that there was a methamphetamine lab located at the Youngs' residence. Sometime thereafter, a third confidential informant advised the officer that a methamphetamine cooking operation was in progress at the Youngs' residence. The officer drove up and down the road located in front of the Youngs' residence in order to survey the property, but the officer did not go directly to the Youngs' home. The officer subsequently obtained a search warrant and executed it at the Youngs' residence.

As a result of evidence found during the execution of the search warrant, the Youngs were charged with trafficking in methamphetamine by manufacture, I.C. § 37-2732B. The Youngs filed motions to suppress evidence obtained pursuant to the search warrant. Kim also filed a motion to suppress statements he made to investigating officers prior to receiving *Miranda* warnings. After an evidentiary hearing, the district court granted the Youngs' motions to suppress evidence, finding that the search warrant failed to particularly describe the place to be searched. The district court also granted Kim's motion to suppress statements, finding that Kim was in custody for purposes of *Miranda* at the time Kim's statements were made. The state appeals, claiming that the district court erred by granting the Youngs' motions to suppress.[2]

## II.

### STANDARD OF REVIEW

■ The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact which are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App.1996). Here, the state does not challenge the district court's findings of fact. Therefore, the issues before us are purely questions of law over which we exercise free review.

## III.

### ANALYSIS

**A. Particularity of the Description of the Place to be Searched**

The district court granted the Youngs' motions to suppress evidence obtained pursuant to the search warrant because it concluded that, as a matter of law, the description of the place to be searched—the Youngs' residence—was constitutionally inadequate. The state asserts that the district court's conclusion was erroneous because the district court failed to consider the impact of the executing officer's knowledge of the place to be searched. The state additionally argues that the district court erroneously shifted the burden of proving the adequacy of the description in the search warrant to the state.

■ The purpose of the Fourth Amendment guarantee of the right to be free from unreasonable searches and seizures is to safeguard the privacy of citizens by insuring against the search of premises where probable cause is lacking. *State v. Yoder*, 96 Idaho 651, 653, 534 P.2d 771, 773 (1975). One such safeguard is the necessity of particularity in

---

1. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The state also claimed that the district court erred by addressing the merits of the Youngs' motions to suppress because the motions were untimely and the district court failed to require

the Youngs to demonstrate good cause or excusable neglect for the delay. *See* I.C.R. 12(d). However, after oral argument, the state withdrew the untimeliness as an issue for this Court's consideration. Therefore, it will not be addressed.

a description of the place to be searched. *Id.* The description must be sufficiently clear so that the place to be searched is recognizable from other neighboring properties. *Id.* The test for determining the sufficiency of the description of the place to be searched is whether the place is described with sufficient particularity as to enable *the executing officer* to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched. *United States v. Gitcho,* 601 F.2d 369, 371 (8th Cir. 1979).

▮ Where one part of the description of the premises to be searched is inaccurate, but the description has other parts which identify the place to be searched with particularity, searches pursuant to such warrants have been routinely upheld. *United States v. Turner,* 770 F.2d 1508, 1511 (9th Cir.1985); *Gitcho,* 601 F.2d at 371. A correct street address, even when no other description is given, is sufficiently particular to withstand constitutional scrutiny because it meets both prongs of the particularity test. *United States v. Dancy,* 947 F.2d 1232, 1234 (5th Cir.1991). Extraneous information, such as a legal or detailed physical description of the premises to be searched, is not required. *State v. Holman,* 109 Idaho 382, 388, 707 P.2d 493, 499 (Ct.App.1985). Because search warrants are not deeds or tax notices, they are not subject to technical drafting requirements and should be interpreted in a commonsense and realistic fashion. *Id.*

Here, the search warrant described the Youngs' residence as:

> Premises located at 4121 East 65th South, Idaho Falls, Bonneville County, Idaho; more specifically described as a blue single story house on a hillside location with an exposed full entry basement on the west side and an overhanging porch on the north side. The residence is at the end of a lane leading south from 65th South, about 1/4 mile. Including barns, outbuildings, cellars and storage areas on the premises and any person and vehicles located on the premises.

It is undisputed that the address listed in the search warrant was the correct address for the Youngs' residence. Although the search warrant did not allege that the street number would be located anywhere on their property, it is also undisputed that the street number was not displayed anywhere on the Youngs' property. The part of the description at issue in the search warrant is the physical description of the Youngs' home, not the correct address listed therein. At the Youngs' suppression hearing, Kim identified the following errors in the search warrant's description of the residence: the home was not blue (it was brown); it was not located on a "hillside" (it was located on a "dome" in the middle of a flat area); it was not a single-story home with a full-entry basement (it was a split-level); it did not have an overhanging porch (there was a sun porch on the top of a shop located north of the home); and, finally, it was not located on a lane leading south from the 65th South (it was located on a lane leading north from 65th South). Kim's testimony also demonstrated that there was a home in the area which matched the description contained in the search warrant in three aspects—it was blue, single-story, and located on a lane leading south from 65th South.

In granting the Youngs' motions to suppress the evidence obtained as a result of the search warrant, the district court stated that more than reasonable effort would be required to locate the Youngs' home even though the correct street address was listed in the warrant. The district court found that insufficient evidence was presented on how to locate the Youngs' home without the street number being visible somewhere on the property. Thus, the district court concluded that the description in the search warrant was not constitutionally adequate because the possibility of searching the wrong home would be great.

We begin our analysis by considering whether the place to be searched was described with sufficient particularity as to enable the executing officer to locate and identify the Youngs' home with reasonable effort. Although the physical description listed in the search warrant was incorrect in some aspects, that was only one part of the description contained in the warrant. Searches have routinely been upheld where one part of

the warrant description is imprecise but the description has other parts which identify the place to be searched with particularity. *Turner*, 770 F.2d at 1511. The street address listed in the search warrant here was correct and, thus, particularly identified the place to be searched. *See Dancy*, 947 F.2d at 1234.

Next, we consider whether there was a reasonable probability that the wrong home would mistakenly be searched. At the Youngs' suppression hearing, the officer who applied for and executed the search warrant testified that he was unaware of the discrepancy in the physical description of the Youngs' residence listed in the search warrant until counsel for the Youngs brought it to the officer's attention. In addition, the officer testified that he was unaware of any other home in the area that matched the description listed in the search warrant. These facts, as testified to by the officer, made a mistaken search of the wrong place unlikely.

More importantly, the officer who applied for and executed the search warrant knew where the Youngs' home was located. The officer testified at the suppression hearing that he had known the Youngs for approximately four years through Kim's involvement in law enforcement matters. The officer further testified that he had been to the Youngs' residence many times prior to the search in question. Contrary to the rationale expressed by the district court, Idaho case law does not require that the description in a search warrant be so specific that an officer with no actual knowledge of the location of the place to be searched could reasonably locate the premises. *See State v. Sapp*, 110 Idaho 153, 155, 715 P.2d 366, 368 (Ct. App.1986). The fact that the officer who applied for the warrant is the same officer who executes it is a factor to be taken into consideration when evaluating the constitutional sufficiency of the description in a search warrant. *See id.* If the same officer is involved in obtaining and executing the search warrant, the purpose of the description—to allow the executing officer to ascertain and identify the property to be searched and to distinguish the intended property

from neighboring property—is more likely to be met. *Id.*

The Youngs argue that because they did not have the street number for their address displayed anywhere on their property, that is equivalent to an incorrect street address because it provided the executing officer no assistance in identifying or locating their residence. Thus, the Youngs claim the description of their residence in the search warrant completely lacked accurate information because of the "incorrect" street address and the inaccurate physical description of their home. The Youngs assert that the executing officer's knowledge of the location of their residence cannot overcome a complete lack of accurate information.

We agree that the executing officer's knowledge of the place to be searched does not substitute for a *complete* lack of accurate information. *See State v. Schaffer*, 112 Idaho 1024, 1028, 739 P.2d 323, 327 (1987). However, in the present case, we are not faced with a complete lack of accurate information. It is undisputed that the search warrant listed the correct street address for the Youngs' home. Although the street number was not found anywhere on the Youngs' property, we reject the Youngs' argument that that is equivalent to an "incorrect" street address. Furthermore, the search warrant did not allege that the street address would be found anywhere on the property. The correct street address, coupled with the executing officer's knowledge of the location of the Youngs' residence from prior personal visits there, made the probability that the wrong place would mistakenly be searched minimal. Moreover, the officer who applied for and executed the search warrant had the Youngs' home under surveillance on the day he obtained the search warrant, further reducing the likelihood that the wrong place would be searched accidentally. *See United States v. Pitts*, 173 F.3d 677, 680–81 (8th Cir.1999) (police surveillance of a location before or during issuance of a warrant is a factor that can compensate for inaccuracies in a warrant's description of place to be searched).

The Youngs direct our attention to two out-of-state cases in support of their proposi-

tion that the executing officer's knowledge cannot be used to overcome a deficiency in a search warrant. *See Shedd v. State,* 358 So.2d 1117 (Fla.Dist.Ct.App.1978); *Anderson v. State,* 657 P.2d 659 (Okla.Crim.App.1983). We are not persuaded by the holdings from these cases because, although it may be the law in Florida and Oklahoma that the language of a search warrant must be strictly construed and that an officer's knowledge of the place to be searched is irrelevant, that is not the law in Idaho. *See Holman,* 109 Idaho at 388, 707 P.2d at 499 (because search warrants are not deeds or tax notices, they are not subject to technical drafting requirements and should be interpreted in a commonsense and realistic fashion); *State v. Carlson,* 101 Idaho 598, 599, 618 P.2d 776, 777 (1980) (fact that officer who had applied for the search warrant also led the search and directed other officers to the house is a relevant factor); *Sapp,* 110 Idaho at 154, 715 P.2d at 367 (fact that the officer who applied for the warrant is the same officer who executes it is factor to be considered when evaluating description in search warrant); *Schaffer,* 112 Idaho at 1028, 739 P.2d at 327 (fact that the officers knew how to reach the residence combined with the description of the house and greenhouse made the prospect of mistaken search remote). Therefore, we reject the Youngs' contention that the executing officer's knowledge of the place to be searched cannot be considered as a factor in determining the sufficiency of the description in search warrant.[3]

Under the circumstances here, we conclude that the description in the search warrant was sufficiently particular in describing the Youngs' residence and, therefore, the district court erred by granting the Youngs' motion to suppress evidence seized pursuant to the search warrant. Because of our disposition of this issue, it is unnecessary to address the state's contention that the district court erroneously shifted the burden of proving the adequacy of the description in the search warrant to the state.

## B. Kim's Statements

At the Youngs' suppression hearing, there was conflicting testimony about what transpired during the execution of the search warrant at the Youngs' residence. The investigating officer testified that the Youngs were not home when he and other officers executed the search warrant but arrived a few minutes later. The officer saw the Youngs pull part way up the lane leading to their home and then stop their vehicle. The officer saw Kim walking toward the home so the investigating officer and another officer drove down to meet Kim. Both officers were armed but neither drew their weapons at any time during their encounter with Young. Once the officers reached Kim, the investigating officer gave Kim the choice of riding to the house in the officer's patrol vehicle or walking the rest of the way. Kim chose to ride in the patrol vehicle. As they were driving to the Youngs' home, the investigating officer explained to Kim why the officers were there and asked Kim to help them locate items that might have been involved in the processing of methamphetamine. The officer did not advise Kim of his *Miranda* rights. After they arrived at the Youngs' home, Kim showed the officers several items that might be relevant to their search. The investigating officer testified that Kim was never handcuffed, was not under arrest, and was free to leave.

Kim testified that as soon as the officers reached him on the lane, the investigating officer told him to get his hands out of his pockets. Kim pulled out a pocketknife and handed it to the investigating officer. The officer then asked Kim what he had thrown on the ground. Kim stated that he had not thrown anything down. The officer then asked Kim where the lab was. When Kim responded that there was no lab, the officer stated, "Don't screw with me, Kim, or I'll take this whole goddamned place from you." The officer ordered Kim into the patrol vehicle. Kim testified that he did not feel he

---

**3.** Citing *State v. Gomez,* 101 Idaho 802, 623 P.2d 110 (1980), the Youngs make an additional argument that a higher degree of particularity in a physical description of the place to be searched is required in a search warrant when the search warrant contains an incorrect street address. Having rejected the Youngs' contention that the absence of a street address anywhere on their property was equivalent to an incorrect street address, we need not consider this assertion.

could walk away because the other officer was "kind of ushering" him everywhere he went. Kim stated that he felt that if he had tried to leave, he would have been tackled or physically prevented from leaving. Kim testified that no officer ever took his arm or touched him in order to direct him where to go. Once they arrived at the Youngs' house, the investigating officer asked him where the "hazardous material" was. Kim was unsure of what the officer meant so he pointed out various items to the officers that he thought they might be looking for. Kim stated that he felt that he was under the officers' control from the time they approached him on the lane leading to his home.

The district court found Kim's version of events more credible than the investigating officer's. The district court's holding that Kim was in custody at the time he made statements to the officers was based on Kim's testimony that he was ordered to get into the investigating officer's vehicle. The district court concluded that, at that point, a reasonable person would not have felt free to leave. The district court further held that, even if Kim was not in custody, his statements must still be suppressed based on the fruit of the poisonous tree doctrine—that Young's statements were obtained as a result of an illegal search. On appeal, the state claims that the district court erred by concluding that Kim was in custody for purposes of *Miranda*.

In *State v. Medrano*, 123 Idaho 114, 844 P.2d 1364 (Ct.App.1992), this Court set forth the analysis to be used when determining whether a given defendant is in custody for purposes of *Miranda*:

> *Miranda* warnings are triggered by custodial interrogation. *See State v. Ybarra*, 102 Idaho 573, 576, 634 P.2d 435, 438 (1981). The United States Supreme Court equated custody with a person being "deprived of his freedom by the authorities in any significant way." *Miranda*, 384 U.S. [436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966) ]. This test has been refined to mean when a person's freedom of action is "curtailed to a 'degree associated with formal arrest.' " *State v. Myers*, 118 Idaho 608, 610, 798 P.2d 453, 455 (Ct.App.1990)

(citing *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 [334–35] (1984)). The Court, in *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 [719] (1977) ... instructed that the "test is an objective one based on the surrounding circumstances." To determine if a suspect is in custody, this Court, subsequent to *Mathiason*, adopted the Supreme Court's test that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Myers*, 118 Idaho at 611, 798 P.2d at 456 (quoting *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151 [82 L.Ed.2d at 336] ).

> We must review the "totality of the circumstances" that are presented in the record. *See Ybarra*, 102 Idaho at 578, 634 P.2d at 440 (citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980)); see also WILLIAM E. RINGEL, SEARCHES & SEIZURES ARRESTS AND CONFESSIONS § 27.3(a)-(c) (circumstances to be considered when determining whether a defendant is in custody are: location of interrogation, conduct of the officers, nature and manner of the questioning, time of interrogation, and other persons present).

*Id.* at 117–18, 844 P.2d at 1367–68.

■ In analyzing whether Kim was in custody, we note that Kim was detained during the execution of a search warrant at his home. The power to search under a valid search warrant, founded upon probable cause, implicitly carries with it the limited authority to safely detain the occupants of the premises while a proper search is conducted. *State v. Slater*, 133 Idaho 882, 889, 994 P.2d 625, 632 (Ct.App.1999). Detention of a defendant during the execution of a search warrant represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. *Michigan v. Summers*, 452 U.S. 692, 703, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340, 350 (1981). Such detentions are "surely less intrusive than the search itself" and "substantially less intrusive than an arrest." *Id.* at 701–02, 101 S.Ct. at 2593–

94, 69 L.Ed.2d at 348–49. Thus, because the "in custody" test for *Miranda* requires a restraint on freedom associated with formal arrest, a person detained during execution of a search warrant is generally not in custody. *See generally United States v. Burns*, 37 F.3d 276 (7th Cir.1994); *United States v. Ritchie*, 35 F.3d 1477 (10th Cir.1994); *State v. Dawson*, 295 Mont. 212, 983 P.2d 916 (1999). However, we recognize that a detention during the execution of a search warrant may rise to a level associated with formal arrest in certain circumstances. *See Moss v. State*, 823 P.2d 671 (Alaska Ct.App.1991); *Proferes v. State*, 13 P.3d 955 (Nev.2000). Thus, whether a person's detention during the execution of a search warrant rises to a degree associated with formal arrest must be determined on a case-by-case basis.

In *Burns*, an officer approached the defendant outside of her motel room and told the defendant that he had a search warrant to search her room. Another officer entered the room with the first officer and the defendant, and the defendant was told to sit on the bed. The first officer began to empty the contents of the defendant's suitcase. At the same time, the officer asked the defendant what she was doing in Milwaukee and the defendant stated she was visiting some friends. When the officer asked who her friends were, she responded that she had no friends in Milwaukee. Approximately three minutes into the search, the officer found a kilogram of cocaine in a dresser drawer. The defendant stated that the cocaine was not hers and that she did not know what it was. A total of three or four minutes elapsed between the time the first officer approached the defendant outside her motel room and the time she stated that the cocaine was not hers. During execution of the search warrant, the defendant asked to leave the room several times but was told she had to stay on the bed until the search was completed. The defendant was not given *Miranda* warnings prior to her formal arrest.

The defendant sought to suppress the statements she made during execution of the search warrant, arguing that the statements should be suppressed because she was not given *Miranda* warnings before the first officer began questioning her. Relying on *Summers*, the court held on appeal that a suspect who is detained during the execution of a search warrant has not suffered a restraint on freedom of movement of the degree associated with formal arrest and, thus, is not in custody for purposes of *Miranda*. The court further held that the specific facts of the case did not suggest a contrary result because the defendant was detained for only a few minutes, she was not handcuffed or physically restrained in any way, only two officers conducted the search, the officers did not brandish their weapons, and the first officer's questioning was limited in scope and duration.

A similar result was reached in *Ritchie*. In that case, the defendant was suspected of robbing a military cash box. As one officer went to obtain a search warrant for the defendant's residence and vehicle, other officers had the defendant and his home under surveillance. Prior to the arrival of the search warrant, the defendant started to leave in his vehicle. Several officers parked their vehicles in front of the defendant's driveway to prevent him from leaving. Without drawing their weapons, the officers instructed the defendant to exit his vehicle. A quick pat-down search was performed and the officers explained the purpose of the stop. The defendant was not arrested and was not given *Miranda* warnings.

The officer with the search warrant arrived on the scene approximately five to ten minutes after the initial detention of the defendant and asked the defendant to come inside the home so that he and another officer could speak with the defendant. As other officers searched the defendant's home, the officer asked the defendant what he had in his pockets prior to conducting a pat-down search. The defendant pulled some money out of his pocket and gave it to the officer. The officer then questioned the defendant about the robbery of the military cash box. The defendant denied any involvement. Subsequently, the officer compared the serial numbers of five $20 bills from the money given to him by the defendant to the serial numbers of the bait bills from the cash box.

The serial numbers of all five bills matched the bait bills. The defendant was formally arrested and given *Miranda* warnings.

The defendant sought to suppress the statements he made, claiming that the officers had violated his rights under *Miranda*. On appeal, the court held that the defendant was not in custody for purposes of *Miranda* because, although the defendant was detained pursuant to *Summers*, he was not held at gunpoint, he was not handcuffed, and force was not used against him. In addition, the court found it significant that the defendant's detention occurred in his own home. The court also noted that there were only two officers present during the questioning of the defendant. The court further recognized that there was a distinction between traditional arrests and detentions pursuant to valid search warrants, citing *Summers*, and concluded that *Summers* supported its determination that the defendant was not in custody for purposes of *Miranda*.

Opposite results were reached in *Moss* and *Proferes*. In *Moss*, officers served a search warrant dressed in police-marked raid gear and entered the defendant's residence with their weapons drawn. After the occupants of the home were ordered to sit on a couch, one officer took the defendant into a back bedroom and closed the door. The officer questioned the defendant about his involvement in trafficking in cocaine without advising the defendant of his *Miranda* rights. The defendant eventually admitted that the officers might find a plate which had some cocaine on it. The defendant also admitted that the numbers on a piece of paper found by other officers represented drug transactions. After about fifteen to twenty minutes, the officer and the defendant returned to the living room. A short while later, officers found cocaine in a toolbox. The defendant was again taken to the back bedroom and the defendant admitted to possession of the cocaine. The officers ultimately left the residence without anyone being arrested. At the defendant's suppression hearing, the officer estimated that the search and questioning of the defendant lasted approximately two and one-half hours. On appeal, the court held that the defendant was entitled to *Miranda* warnings before being questioned while detained during the execution of the search warrant at his home. Central to the court's holding was the amount of force the officers used to enter and maintain control of the defendant's residence and the extensive questioning of the defendant. The court concluded that, although the officer told the defendant he was not under arrest, the defendant was still deprived of his freedom of action in a significant way.

In *Proferes*, while officers were executing a search warrant at a home, the defendant knocked on the door. The officers answered the door and directed the defendant to enter but the defendant turned and ran. The officers tackled the defendant in the front yard, handcuffed him, and took him inside the home. Once inside, one of the officers began a pat-down search of the defendant. Another officer, without advising the defendant of his *Miranda* rights, asked him if he had any weapons or controlled substances. The defendant replied that he did and gestured toward his coat pocket. The officer reached inside and recovered a package containing methamphetamine. On appeal, the court held that the defendant was in custody for purposes of *Miranda*. The court noted that after the defendant was captured, he was handcuffed and not free to leave. As such, the court held that the defendant was entitled to *Miranda* warnings before being asked whether he had drugs in his possession.

■ Upon review, we conclude that the present case is more factually similar to *Burns* and *Ritchie*. The officers here did not draw their weapons at any time during their encounter with Kim and no force or threat of force was used. Kim was not handcuffed. Although the officers controlled Kim's movements to a certain degree, they did not control his movements to a degree associated with formal arrest. Kim was not tackled nor physically forced to go anywhere. The officers did not put their hands on Kim or in any way touch him in order to control his movements and their weapons were not drawn. Officers are permitted to detain a person during the execution of a search warrant pursuant to *Summers*, which implicitly gives officers the authority to control the

movements of a detainee to some extent. Further, the officers' questioning of Kim was limited in scope and duration. Accepting Kim's version of events as we must, it appears that the officer's questioning of Kim involved two areas—what was or may have been in his pockets and whether he knew where various items involved in processing methamphetamine might be located. Although the record does not indicate the amount of time it took to search the Youngs' residence and question Kim, in his appellate brief Kim states that it only took several minutes.

For these reasons, we hold that Kim was not in custody for purposes of *Miranda* and that the district court erred by granting Kim's motion to suppress statements he made prior to receiving *Miranda* warnings. Because we uphold the search warrant as describing the place to be searched with sufficient particularity, we further hold that the district court also erred by concluding that Kim's statements should be suppressed based on the fruit of the poisonous tree doctrine.

## IV.

### CONCLUSION

The description of the Youngs' residence contained in the search warrant was sufficiently particular in describing the place to be searched. Although the physical description of the Youngs' home was inaccurate in some aspects, the correct street address coupled with the executing officer's knowledge of the place to be searched made the prospect of searching the wrong residence minimal. Therefore, we hold that the district court erred by granting the Youngs' motion to suppress evidence seized pursuant to the search warrant. Because of our disposition of this issue, we need not address the state's contention that the district court erroneously shifted the burden to the state of proving that the description in the search warrant was adequate.

In addition, Kim was not in custody for purposes of *Miranda* at the time he made statements to officers executing the search warrant. Officers are permitted to detain a person during the execution of a search warrant. Under the specific facts of this case, Kim's detention did not rise to a degree associated with formal arrest. Therefore, we hold that the district court erred by granting Kim's motion to suppress statements he made to the officers prior to receiving *Miranda* warnings. Because we uphold the search warrant as describing with particularity the place to be searched, the district court also erred by concluding that Kim's statements should alternatively be suppressed based on the fruit of the poisonous tree doctrine.

The district court's orders granting the Youngs' motions to suppress are reversed and the cases are remanded.

Chief Judge SCHWARTZMAN and Judge LANSING concur.